UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON,

    Plaintiff,

    v.

MONSANTO COMPANY, *et al*.,

    Defendants.

Case No. C17-53RSL

ORDER GRANTING STATE OF WASHINGTON'S MOTION TO REMAND

This matter comes before the Court on plaintiff's motion to remand, Dkt. # 15. Having reviewed the materials submitted by the parties and the remainder of the record, the Court grants the motion for the reasons that follow.

In December 2016, plaintiff, the State of Washington ("Washington"), sued defendant Monsanto Company ("Monsanto") in King County Superior Court for allegedly contaminating water, land, and wildlife throughout the state's territory with toxic chemicals called polychlorinated biphenyls ("PCBs"). Dkt. # 1-26. According to Washington's complaint, PCBs are synthetic chemical compounds that were used in the production of a wide variety of industrial and commercial products until January 1979, when Congress banned their manufacture and use through the Toxic Substances Control Act. Dkt. # 1-26 at 2, 19–20. From 1935 to 1979, Monsanto[1] was the sole manufacturer of PCBs in the United States. Dkt. # 1-26 at

---

[1] The original Monsanto Company operated within three main industries: agricultural products, chemical products, and pharmaceuticals. In the late 1990s, Monsanto Company spun off into three

ORDER GRANTING MOTION TO REMAND - 1

2, 6, 8. Washington claims damages from this contamination and asserts various tort causes of action against Monsanto.

In January 2017, Monsanto removed the suit, arguing that this Court has jurisdiction under 28 U.S.C. § 1442(a)(1) because in producing PCBs Monsanto had been "acting under color of an officer or agency of the United States," and under 28 U.S.C. § 1331 and Article I, section 8, clause 17 of the U.S. Constitution because Washington's tort claims "arise, in part, on 'federal enclaves' and under federal laws." Dkt. # 1 at 1. (Because Washington is itself a state, it is not a "citizen" of any state, and accordingly no diversity jurisdiction under 28 U.S.C. § 1332 exists here. See Illinois v. City of Milwaukee, Wis., 406 U.S. 91, 97 n.1 (1972).) In response, Washington filed this motion to remand, arguing that this Court lacks federal subject-matter jurisdiction under both of Monsanto's asserted theories. Dkt. # 15.

This order addresses each of Monsanto's two theories in turn.

**A.  Federal Officer Jurisdiction**

Under 28 U.S.C. § 1442(a)(1), a civil action that is commenced in a state court against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office," may be removed to federal district court. This statute's "basic purpose is to protect the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Federal Government acting . . . within the scope of their authority." Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 150 (2007) (internal quotation marks omitted); see also Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1253 (9th Cir. 2006) ("If the federal government can't guarantee its agents

---

separate corporations, each responsible for a different industry: Monsanto Company retained the agricultural products business; Solutia, Inc. assumed the chemical products business; and Pharmacia Corporation assumed the pharmaceutical business. Each assumed certain assets and liabilities from the original Monsanto Company, and all are defendants in this case. Dkt. # 1-26 at 5–7. In this order, the Court refers to all three defendants as "Monsanto."

ORDER GRANTING MOTION TO REMAND - 2

access to a federal forum if they are sued or prosecuted, it may have difficulty finding anyone willing to act on its behalf."). The statute must be liberally construed to give full effect to that purpose. See Colorado v. Symes, 286 U.S. 510, 517 (1932).

Per the terms of the statute, a private person can invoke federal officer jurisdiction if he is sued for acts performed while "acting under" a federal agency or officer. A defendant is "acting under" a federal officer or agency when he acts according to the officer's "subjection, guidance, or control," in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." Watson, 551 U.S. at 151–52. While the Supreme Court has suggested that private contractors might "act under" a federal agency by "helping the Government to produce an item that it needs," it has not specifically clarified "whether and when particular circumstances may enable private contractors to invoke the statute." Id. at 153–54. The Ninth Circuit, however, has held that a private entity may invoke federal officer jurisdiction only if it can show: (1) it is a "person" within the meaning of the statute; (2) a causal nexus exists between the plaintiff's claims and the actions the entity took pursuant to a federal officer's direction; and (3) it has a colorable federal defense to the plaintiff's claims. Leite v. Crane Co., 749 F.3d 1117, 1120 (9th Cir. 2014) (citing Durham, 445 F.3d at 1251).

To overcome Washington's challenge to the factual basis for federal officer jurisdiction, Monsanto must show by a preponderance of the evidence that each of the requirements for federal officer jurisdiction has been met, supporting its jurisdictional allegations with "competent proof" under the same evidentiary standard that governs in the summary judgment context. See Leite, 749 at 1121–22. If the existence of jurisdiction turns on disputed factual issues, the Court may resolve those factual disputes itself, unless the disputed factual issue is "intertwined with an element of the merits of the plaintiff's claim." Id. at 1121–22 & n.3.

Monsanto concedes that it manufactured and sold PCBs, but contends that it did so (1) in facilities financed by the federal government to meet the military's needs pursuant to "Necessity Certificates"; (2) at the express direction and command of the federal government pursuant to the Defense Production Act; (3) as a direct contractor for multiple departments and agencies of

ORDER GRANTING MOTION TO REMAND - 3

the federal government; (4) for federal defense contractors who needed PCBs to meet exacting military specifications; and (5) for uses required by federal OSHA regulations.  Based on the above circumstances, Monsanto claims that it was acting as an agent of the United States and "under color" of that office when it produced and sold PCBs.

Specifically, Monsanto represents that during World War II the federal government relied on Monsanto's PCBs for certain military uses, and that most of the PCBs that Monsanto produced at that time were "for use by" the United States military.  Dkt. # 1, ¶ 9.  In 1941, when Monsanto's facilities were unable to meet the demand for PCBs, the government approved various "Necessity Certificates" for construction of additional Monsanto facilities.  Dkt. # 1, ¶ 10.  Monsanto did not have a contract with the United States government or its agencies for the PCBs produced in these additional facilities.  See Dkt. # 1-6 at 4; Dkt. # 1-10 at 3; Dkt. # 1-11 at 13.  Rather, Monsanto produced PCBs for use by other companies, such as General Electric Co., in their production of items such as electrical transformers and condensers, demand for which "greatly increased" during the war.  Dkt. # 1-6 at 4–5; Dkt. # 1-10 at 3–5; Dkt. # 1-11 at 14–15.

After World War II the federal government continued to rely on Monsanto's PCBs, and specifically mentioned Monsanto's PCBs by trade name in its military specifications for products like electrical wire and heat-resistant aluminum paint.  Dkt. # 1, ¶ 15; Dkt. # 1-2 at 7 (providing that Monsanto's PCB "Aroclor" is "an example of a formulation contemplated by this specification but in no way is the supplier restricted to this formulation").  In addition to buying other companies' products that incorporated Monsanto's PCBs, the government also occasionally bought PCBs directly from Monsanto.  See Dkt. # 1-22.

Monsanto further represents that in 1970 it decided to stop manufacturing PCBs for certain applications due to their environmental impact, but that in the early 1970s the federal government invoked Section 101 of the Defense Production Act of 1950 to direct Monsanto to continue to produce PCBs for such uses by military contractors, despite Monsanto's warnings about the environmental risks.  Dkt. # 1, ¶ 17; Dkt. # 1-16 at 2; Dkt. # 1-17 at 2–4; Dkt. # 1-19 at 2; Dkt. # 1-21 at 2.

ORDER GRANTING MOTION TO REMAND - 4

The Court concludes that Monsanto has not met all three requirements for federal officer jurisdiction. Monsanto has failed to show that it produced PCBs – and then deliberately concealed their toxicity – "pursuant to a federal officer's direction," and accordingly it has failed to meet the second element of the Ninth Circuit's test for federal officer jurisdiction. See Leite, 749 F.3d at 1120.

To establish federal officer jurisdiction, a purchase order from the government is not enough. Rather, the removing defendant must show that the government *supervised* or *influenced* the way in which the defendant performed the allegedly culpable activities. For example, in Cabalce v. Thomas E. Blanchard & Associates, Inc., 797 F.3d 720 (9th Cir. 2015), the Ninth Circuit held that a corporation acting pursuant to a contract with the U.S. Department of the Treasury was nevertheless not "acting under" that federal agency where the agency did not control or supervise the corporation's performance of its contractual duties.

In that case, the Treasury Executive Office for Asset Forfeiture contracted with VSE Corporation to store and then destroy fireworks seized by the federal government. VSE subcontracted with another corporation to store the fireworks. During their storage, the fireworks exploded and killed five workers in the storage facility. Id. at 723–24. When VSE was sued for the workers' deaths, it removed, invoking federal officer jurisdiction. The district court granted the plaintiffs' motion to remand, id. at 726, and the Ninth Circuit affirmed, id. at 723. On the basis of the district court's factual finding that VSE did not act at the direction of the federal government in choosing its method of storing and disposing of the fireworks, which VSE did not challenge on appeal, id. at 728 n.2, the Ninth Circuit concluded that "[t]he record is bereft of any factual support for VSE's assertion that its conduct was causally connected to the federal government's 'subjection, guidance, or control,'" id. at 728 (quoting Watson, 551 U.S. at 151).

Similarly, Monsanto produced its PCBs and concealed their dangerousness without *any* government control or supervision. Though Monsanto suggests that it produced PCBs to government specification, Dkt. # 1, ¶ 50, the documents presented by Monsanto show rather that

ORDER GRANTING MOTION TO REMAND - 5

the government listed certain Monsanto PCBs as examples of component parts that would satisfy specifications for other products. That is, Monsanto's PCBs were *mentioned in* a government specification, not *produced to* government specification. Notably, even these specifications do not require the use of Monsanto's PCBs, and accordingly Monsanto cannot argue that the specifications required Monsanto to produce the PCBs. See Dkt. # 1-2 at 7 (providing that "in no way is the supplier restricted to" the sample formulations listed, including Monsanto's PCB Aroclor). And while the government did purchase PCBs from Monsanto, see Dkt. # 1-22; Dkt. # 20, the government did not contract with Monsanto to produce PCBs *on the government's behalf*. See Watson, 551 U.S. at 154 (suggesting that a private contractor might "act under" the government where it "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.").

The absence of government control over the challenged conduct distinguishes this case from the Agent Orange litigation that Monsanto cites in support of removal. In the "Agent Orange" Product Liability Litigation, 304 F. Supp. 2d 442 (E.D.N.Y. 2004), Judge Weinstein found that the government had exercised a "substantial degree of direct and detailed federal control over the defendant's work" by "maintain[ing] strict control over the development and subsequent production of Agent Orange." Id. at 447 (quoting Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 399 (5th Cir. 1998)). Judge Weinstein contrasted that "strict control" with the facts of Arness v. Boeing North American, 997 F. Supp. 1268 (C.D. Cal. 1998), where government specifications required Boeing to clean mechanical engines with a toxic substance "but did not specify how Boeing was to dispose of the cleanser." Id. at 448. Because Boeing's disposal of the toxic substance was the basis for the plaintiffs' claims, no nexus existed to support federal officer jurisdiction in Arness. But in the Agent Orange case, because the chemical company's government-controlled conduct was the basis for the plaintiffs' claims, federal officer jurisdiction existed. See 304 F. Supp. 2d at 447–48.

In this case, like in Arness, the government did not oversee or specify *how* Monsanto was to perform the activities that form the basis for Washington's claims: the formulation,

ORDER GRANTING MOTION TO REMAND - 6

manufacture, and promotion of PCBs, which the government valued for their flame-resistant characteristics, not their toxicity.  (In the Agent Orange cases, of course, the toxicity was the point.)  Accordingly, even if the government contracted for Monsanto's PCBs, the Court cannot say that Monsanto was "acting under" a federal agency where the government did not direct Monsanto to produce and promote PCBs *in a particular way*.

Moreover, the government's approval of a "Necessity Certificate" for expansion of Monsanto's facilities does not, as Monsanto argues, demonstrate that during World War II Monsanto's facilities were "essentially nationalized."  Dkt. # 1, ¶ 36.  This is so even if most of the PCBs that Monsanto produced in those facilities ultimately fell into the government's hands due to the government's contracts with third parties, like General Electric, that incorporated Monsanto's PCBs into their products.  As Judge Weinstein observed in the context of an earlier Agent Orange case:

> From the standpoint of federalism, the mere assertion of a nebulous federal procurement interest cannot, without further speculation, be a basis for removal.  Otherwise any state suit against a manufacturer whose product has at one time been diverted and adapted for military use – for example, a nuisance suit against a metal foundry – would potentially be subject to removal, seriously undercutting the power of the state courts to hear and decide basic tort law.  Such a result is incompatible with the respect owed to state courts under our federal system.

Ryan v. Dow Chem. Co., 781 F. Supp. 934, 950–51 (E.D.N.Y. 1992).  Here, where Monsanto's claim to government direction is similarly tenuous, federalism principles caution similarly against removal.

The strongest evidence in support of federal officer jurisdiction are two letters to Monsanto from the U.S. Department of Commerce, sent in 1972 and 1974.  Dkt. # 1-16; Dkt. # 1-19.  Both letters direct Monsanto to fulfill a third party's purchase order for PCBs by a particular date and invoke Section 101 of the Defense Production Act of 1950.  Section 101 provides for "priority in contracts and orders" and authorizes the President "to require that performance under contracts or orders . . . which he deems necessary or appropriate to promote

ORDER GRANTING MOTION TO REMAND - 7

the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance." 50 U.S.C. § 4511(a) (formerly codified at 50 App.U.S.C. § 2062). This provision was enacted to reconcile conflicts between scheduled commercial production and sudden military needs in favor of war production. See Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 981–82 (5th Cir. 1976).

As Washington points out, however, even these letters "directing" Monsanto to deliver PCBs do not actually direct Monsanto to produce PCBs that it had not already, or would not have otherwise, produced – and, more particularly for purposes of Washington's lawsuit, the letters do not direct Monsanto to conceal the toxicity of PCBs. Accordingly, Monsanto has failed to demonstrate a "causal nexus" between Washington's claims and any actions that Monsanto took pursuant to a federal officer's direction. See Cabalce, 797 F.3d at 728.

Because Monsanto has failed to prove the second element of the Ninth Circuit's test for federal officer jurisdiction, the Court expresses no opinion as to the first and third elements – whether Monsanto is a "person" within the meaning of the statute, and whether Monsanto has stated a colorable federal defense. See Leite, 749 F.3d at 1120.

**B.      Federal Question Jurisdiction**

Monsanto next asserts two separate bases for federal question jurisdiction under 28 U.S.C. § 1331:  first, "federal enclave" jurisdiction; second, traditional "federal question" jurisdiction based on the claims in Washington's well-pleaded complaint.

1.      *Federal enclave jurisdiction*

Federal courts have federal question jurisdiction over tort claims that arise on "federal enclaves." 28 U.S.C. § 1331; Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1250 (9th Cir. 2006). Land acquired by the federal government with the consent of a state legislature "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings" becomes a "federal enclave." Willis v. Craig, 555 F.2d 724, 726 (9th Cir. 1977) (per curiam) (quoting U.S.

ORDER GRANTING MOTION TO REMAND - 8

Const. Art. I, sec. 8, cl. 17); see also Surplus Trading Co. v. Cook, 281 U.S. 647, 652 (1930). Only federal law applies on a federal enclave, but preexisting state law not inconsistent with federal policy becomes federal law and applies as well, until altered by federal legislation. See Paul v. United States, 371 U.S. 245, 268 (1963); Pacific Coast Dairy v. Dep't of Ag. of Cal., 318 U.S. 285, 294 (1943). Accordingly, removal of state tort claims is proper where the complaint reveals that some claims "arose on federal enclaves." See Durham, 445 F.3d at 1250.

Monsanto argues that federal enclave jurisdiction exists in this case because several of the allegedly contaminated water bodies mentioned in Washington's complaint are "on or near" federal territories, including military bases. Dkt. # 1 at 8–10, 13–15, 20–23. But Washington asserts that it does not seek damages for contamination to waters and land within federal territory, as it would not have standing to do so. Dkt. # 15 at 23–27. The Court is satisfied that, because Washington avowedly does not seek relief for contamination of federal territories, none of its claims arise on federal enclaves.

Accordingly, the Court may not exercise jurisdiction on federal enclave grounds.

2. *Federal question in Washington's complaint*

Of course, this Court has subject-matter jurisdiction over federal claims that appear on the face of a plaintiff's well-pleaded complaint. 28 U.S.C. § 1331; Aetna Health Inc. v. Davila, 542 U.S. 200, 207 (2004) (quoting Taylor v. Anderson, 234 U.S. 74, 75–76 (1914)). Monsanto argues that Washington has pled a claim under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) by alleging damages to the state's natural resources, even though Washington characterizes its own claims as state tort claims rather than federal claims under CERCLA.

It is true that CERCLA establishes a federal cause of action for "damages for injury to, destruction of, or loss of natural resources," 42 U.S.C. § 9607(a)(4)(C), and that an action under this provision may be brought by a state "on behalf of the public as trustee of such natural resources to recover for such damages," 42 U.S.C. § 9607(f)(1). It is also true that where a state law claim is "completely preempted" by a federal statute, "even a well-pleaded state law

ORDER GRANTING MOTION TO REMAND - 9

complaint will be deemed to arise under federal law for jurisdictional purposes." Hall v. N. Am. Van Lines, Inc., 476 F.3d 683, 687 (9th Cir. 2007) (citations omitted).  But CERCLA expressly did not preempt state law claims "with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a).  While Washington may not recover damages under CERCLA for the same removal costs or damages sought in this state law suit, 42 U.S.C. § 9614(b), it is free to seek relief through state law rather than through CERCLA.

Monsanto further argues that because Washington seeks damages for natural resources, "a natural resource claim" is an element of Washington's tort causes of action and therefore "an actually disputed and substantial" federal question exists.  See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005).  But because a court could resolve Washington's tort claims without entertaining "a dispute or controversy respecting the validity, construction or effect of federal law," no federal question is presented.  See id. at 313 (quoting Shulthis v. McDougal, 225 U.S. 561, 569 (1912).

For all the foregoing reasons, the State of Washington's motion to remand, Dkt. # 15, is GRANTED.  The Clerk of Court is directed to remand this matter to the King County Superior Court.

DATED this 28th day of July, 2017.

Robert S. Lasnik
United States District Judge

ORDER GRANTING MOTION TO REMAND - 10